STATE OF MAINE                                    SUPERIOR COURT
YORK, ss.                                         Civil Action
                                                 Docket No. 18-144

**SEA SALT, LLC**, a Maine Limited          )
Liability Company with a principal place    )
of business in York County, Maine,          )
                                            )
                **Plaintiff,**              )
                                            )
        v.                                  )      **FIRST AMENDED COMPLAINT AND**
                                            )      **DEMAND FOR JURY TRIAL**
**MATTHEW R. BELLEROSE** and                )
                                            )
**AMANDA F. BELLEROSE**, married            )
individuals living in the City of           )
Scarborough, County of Cumberland, and      )
State of Maine,                             )
                                            )
**VINCENT J. MASTROPASQUA**, an             )
Individual residing in the City of Portland,)
County of Cumberland, and State of          )
Maine,                                      )
                                            )
**ANTHONY J. MASTROPASQUA**, an             )
Individual residing in the City of          )
Scarborough, County of Cumberland, and      )
State of Maine,                             )
                                            )
**EAST END TRANSPORT, LLC,** a              )
Maine Limited Liability Company with a      )
principal place of business in Cumberland   )
County, Maine,                             )
                                            )
    and                                     )
                                            )
**UNITED PARCEL SERVICE, INC.,**            )
an Ohio Corporation doing business          )
in the State of Maine,                      )
                                            )
                **Defendants**              )

1

NOW COMES the Plaintiff, Sea Salt, LLC, by and through undersigned counsel, and hereby amends its Complaint against Defendants as follows:

## INTRODUCTION

1.      Plaintiff's original Complaint pleaded a civil action for conversion, fraud, breach of fiduciary duty, negligent misrepresentation, breach of contract, and violation of the Maine Uniform Deceptive Trade Practices Act, stemming from the embezzlement of nearly $1.5 million in live lobster product and associated UPS shipping costs from Sea Salt, LLC ("Sea Salt"), over the past eighteen months alone.

2.      Plaintiff's First Amended Complaint includes those original claims, and now adds the following Defendants to this case: (A) Matthew R. Bellerose's wife, Amanda F. Bellerose, who has been unjustly enriched, engaged in conversion, and profited from her husband's fraud; (B) Anthony J. Mastropasqua, the brother of Vincent Mastropasqua, who upon information and belief was also involved in the fraudulent scheme described herein; and (C) United Parcel Service, Inc. ("UPS"), whose employee or employees, acting within the scope of employment and as agents of UPS, negligently enabled Matthew R. Bellerose to carry out this fraudulent scheme.

3.      In addition, Plaintiff brings claims for civil remedies under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1964, due to the crimes and conspiracy to commit the crimes involved in this case.

## THE PARTIES

4.      Plaintiff Sea Salt, LLC ("Sea Salt") is a Maine Limited Liability Company engaged in the wholesale lobster distribution business in the City of Saco, County of York, and State of Maine.

5.      Defendant Matthew R. Bellerose (hereinafter "MRB") is an individual who at all times herein relevant resided in the City of Scarborough, County of York, and State of Maine, and was a purported member of Sea Salt, LLC.

6.      Defendant Amanda F. Bellerose (hereinafter "AFB") is the wife of Defendant Matthew R. Bellerose, and at least until June of 2018 she resided with him in the City of Scarborough, County of York, and State of Maine.

7.      Defendant Vincent J. Mastropasqua (hereinafter "VJM") is an individual residing in the City of Portland, County of Cumberland, and State of Maine.

8.      Defendant Anthony J. Mastropasqua (hereainafter "AJM") is an individual residing in the City of Scarborough, County of Cumberland, and State of Maine.

9.      Defendant East End Transport, LLC (hereinafter "East End") is a Maine Limited Liability Company with a principal place of business in the City of Scarborough, County of Cumberland, and State of Maine.

10.     Defendant United Parcel Service, Inc. (hereinafter "UPS") is an Ohio Corporation operating shipping services to customers throughout the country, including in the State of Maine. UPS is also the parent company of the UPS Store, Inc., which employs or has employed Defendant VFM.

## JURISDICTION AND VENUE

11.     Jurisdiction and venue are proper in this Court because Plaintiff's principal place of business is in York County, and many of the activities described herein occurred in the County of York and State of Maine.

## BACKGROUND FACTS

### The "Fraudulent Scheme"/Embezzlement

12.     As set forth in Plaintiff's original Motion for *Ex Parte* Attachment, this is a case of embezzlement from Plaintiff's wholesale lobster distribution company, Sea Salt, LLC, by Defendants using the fictitious customer name "Mastro's." The highly detailed facts of this case are described with particularity in the Affidavits of Shawn McEwen, Morey Highbarger, David Breau, and Michael McKellar. These affidavits establish a longstanding fraudulent scheme by Defendants to divert at least $1.5 million in profits from Sea Salt, by converting a massive amount of Plaintiff's lobster inventory, and reselling it for Defendants' own personal profit.

13.     Defendant MRB abused his role as a trusted business partner and embezzled, along with the other Defendants, **$1,496,427.67** from Sea Salt in the past 18 months alone.

14.     In 2017, after 8 years of employment, Defendant MRB, via the fraud set forth herein, became a purported 20% owner of Sea Salt, LLC.

15.     MRB, along with Defendant VJM, are the sole members of Defendant East End Transport, LLC, which was the entity that paid the invoices of a fictitious customer called "Mastro's."

16.     East End does not have a legitimate business location. Rather, its address is the same as the UPS store located at 201 U.S. Route 1 in Scarborough, Maine, and the same as Defendant VJM's PO Box, Number 316.

17.     Upon information and belief, the fraudulent activity described in Plaintiff's Motion for *Ex Parte* Attachment was a joint venture between MRB and VJM, under the sham name "East End Transport," which is why the fictitious customer they created in furtherance of their embezzlement scheme was called "Mastro's."

18.     East End Transport paid all of the invoices to "Mastro's" in furtherance of Defendants' fraudulent scheme to embezzle more than $1.4 million from Sea Salt.

19.     The address for "Mastro's" is also the UPS Store located at 201 U.S. Route 1 in Scarborough, Maine, PO Box Number 316.

20.     Upon information and belief, MRB and VJM are not engaged in any legitimate business activity under the name "East End Transport" aside from their fraudulent scheme to embezzle more than $1.4 million from Sea Salt.

21.     Defendants engaged in significant comingling of funds, sufficient to justify piercing the corporate veil and holding MRB and VJM personally liable for the conduct described herein.

22.     The profits from Defendants' embezzlement and resale of lobster from Sea Salt have been deposited in accounts under the name "East End Transport" or "East End."

23.     Further, based on the criminal activity and conspiracy to commit fraud and conversion described below, East End Transport, LLC is merely the alter ego of MRB and VJM, sufficient to justify piercing the corporate veil and holding Defendants personally liable for the conduct described herein.

24.     In 2017, Sea Salt discovered that it was showing a substantial loss of product.

25.     As a result, the company retained both a forensic accountant and a controller to investigate the source of inventory loss.

26.     At all relevant times, MRB was the floor manager at Sea Salt and oversaw the order fulfillment and shipping process of lobsters via UPS.

27.     To fulfill orders, MRB would print a UPS label to affix to the box for shipping. He would then generate a bill of lading for the total amount of lobster shipped to a customer.

MRB would then create an invoice in Sea Salt's accounting software based on the bill of lading, which included both the cost of the product and the shipping charges.

28.     From a bookkeeping perspective, any disparity in the amount of lobster shipped versus the amount of lobster that was actually billed would not be detected as long as the manual bill of lading created by MRB matched the invoice he generated.

29.     If no bill of lading or invoice was produced, then nobody would be the wiser if inventory was disappearing—at least in the short term.

30.     In 2017, Defendant MRB purported to bring in a new customer named Mastro's.

31.     While MRB did generate some bills of lading and invoices for lobster he shipped to Mastro's, he only did so for a fraction of the product actually shipped. As set forth in the Affidavit of David Breau, Sea Salt's controller, there is a tremendous disparity in the amount of product actually shipped to Mastro's during the time period summarized in the Motion for *Ex Parte* Attachment (November 24, 2017 through the end of April 2018) and the amount that was invoiced and paid for.

32.     In his efforts to uncover the source of this discrepancy, Breau performed a weekly comparison of the legitimate sales and shipping charges to Mastro's, which Bellerose recorded in Sea Salt's Quickbooks program, against UPS shipping records for the same time period.

33.     The UPS records showed the actual weight of product sent to Mastro's customers via UPS, most of which was never invoiced by or paid to Sea Salt in Quickbooks.

34.     Breau was able to discern that Mastro's has been billed and Sea Salt has collected just over $250,000.00 for lobster and shipping between November 2017 and April 2018.

35.     By contrast, Breau's investigation of UPS shipping records showed that MRB shipped nearly $1.5 million in product and shipping charges to Mastro's during the same time period.

36.     According to Breau's calculations, the irrefutable total loss to Sea Salt between November 2017 and the end of April 2018 was $471,620.57.

37.     Averaging that loss over the 22-week period, this amounts to an average weekly loss of $21,437.30.

38.     Applying the average weekly theft amount ($21,437.30) to the time period between 1/1/17 and 11/24/17 when the UPS invoices above are summarized for the Court (total of 47 weeks), it is highly likely that Sea Salt sustained a loss of $21,437.30 x 47 = $1,007.553.10.

39.     The loss was less dramatic once Breau began carefully tracking Sea Salt's inventory.  In the approximately two months from May to the end of June 2018, when MRB was terminated, the loss was only $17,254.00, and $16,640.36 of that amount was due to the fact that MRB was removed from the premises before he prepared the invoice to Mastro's for the final week of his employment.  During this time period, MRB could not get away with stealing inventory without detection.

40.     Putting the above numbers together, Defendants collectively embezzled at least $1,496,427.67 from Sea Salt.[1]

---

[1] Plaintiff is continuing to investigate the full amount of loss occasioned by Defendants' theft and believe that it likely is more extensive than what has been discovered thus far and is likely in excess of $2,000,000.  Breau Aff at ¶ 131.

41.     When Sea Salt confronted MRB with this information, he admitted having stolen from the company.

42.     In particular, when his business partners raised these irregularities, MRB stated, "I know how this looks.  This looks really bad."  Highbarger Aff at Exhibit A, p. 11.  He pleaded with his partners: "Tell me how to resolve it."

43.     MRB offered to pay back the money he fraudulently converted to his and the other Defendants' unlawful use, stating: "I gave you the 65 or whatever and I might have 80 or 90.  Give me a number and I can, I'll have to chip away at it."

44.     When pointedly asked by one of his partners why he did it, MRB acknowledged the wrongdoing by asking: "Does it really matter?"

45.     Shortly thereafter, MRB sent his partners an apologetic text that read: "Guys, I just want to say I'm really sorry.  Not only have I betrayed your trust but years of friendship as well and that alone will haunt me forever… I'd like to resolve this as best as I possibly can with you guys without my innocent family having to suffer for my bad decisions."

46.     In this same text exchange, MRB attempted to explain the embezzlement: "I was just trying to cover the expense of buying my 20% [share of Sea Salt, LLC] as I wouldn't have been able to do it otherwise."

47.     Based on these facts and the other information set forth in Plaintiff's Affidavits, Defendants collectively and fraudulently embezzled substantial funds from Plaintiff.

48.     The McKellar Affidavit shows that this fraudulent scheme went back as far as 2015, making the likely amount of loss well over $1.5 million and likely in excess of $2 million.

49.     VJM has recently claimed to be unaware of the illegal profits earned by East End, the company he alone incorporated.  In an Affidavit submitted to this Court along with a Motion

to Dissolve the Attachment granted against him, VJM swore under oath that "Matthew Bellerose was solely responsible for the purchasing, shipping, and payment of lobsters." This statement is false.

50.     Plaintiff found an invoice and a credit card transaction receipt showing that VJM paid for lobster and shipping on behalf of the customer "Mastro's" with his own credit card, not East End Transport's. On October 3, 2017, VJM personally paid for $4,920.00 in lobster sales to "Mastro's."

51.     VJM has no legitimate business connection to the lobster industry or restaurant business.

52.     Sea Salt also found a bill of lading and credit card sale transaction that showed VJM paying for another $4,509.00 in lobster the next day, October 4, 2017, with his own personal credit card, calling himself "Mastro's," not East End Transport.

53.     VJM himself purchased nearly $10,000.00 in lobster from Sea Salt, on his own credit card under the name Mastro's, and not for East End Transport, LLC.

## Defendant Amanda F. Bellerose's Conscious Disregard of Illegal Activity, Spending of Illegal Gains, Unjust Enrichment, and the Need for a Constructive Trust

54.     As part of VJM's Motion to Dissolve Attachment described above, Defendant AFB's text conversation with him suggests she had knowledge of this fraudulent scheme all along, not that she was an innocent party. For instance, Exhibit A to VJM's Affidavit contains text messages wherein AFB tells VJM, "I will get you out of this for sure . . . you had nothing to do with it, and I'll be sure they know that." These text conversations beg the question, if AFB had no knowledge of what was going on, how does she know that VJM had "nothing to do with it"?

55.    The more likely explanation for AFB's statement is that she knew, or at least consciously disregarded her knowledge of, this fraudulent scheme.

56.    It is equally plausible that VJM or his brother AJM coercively convinced AFB and MRB to send VJM text messages, disclaiming his involvement in this fraudulent scheme, from which VJM admittedly profited.

57.    Like VJM, AFB profited from, spent, and paid family bills out of the proceeds of the other Defendants' fraud, making her retention of any such profits unjust.

58.    As described below, AFB monitored and used for her own purposes the lobsterorder@gmail.com address that her husband also used to conduct his illegal activity.  This fact, combined with the couple's unusual spending activity (only a fraction of which is described below), makes it highly unlikely that AFB did not know that she was spending illegal gains from her husband's fraud.

59.    Within the meaning of RICO, as outlined in Counts VI and VII below, AFB was not an innocent, unknowing party who is entitled to retain an interest in a home where the mortgage has been paid on a monthly basis out of profits stolen from Sea Salt.  The same is true for payments made to her attorney, or her bank accounts, where illegally obtained profits were comingled with purportedly legitimate earnings.

60.    MRB and AFB have a mortgage on their property at 5 Freedom Road in Scarborough that exceeds $300,000.00.

61.    MRB and AFB's monthly mortgage payment is likely close to $2,000.

62.    AFB claims to have preserved $100,000 of her own savings separately, which means that MRB paid their mortgage and family expenses every month.  Therefore, AFB has been living in a home financed with funds stolen from Sea Salt.

63.     MRB and AFB had a pool and an outdoor kitchen installed in their backyard in 2017.

64.     MRB and AFB made improvements to their home in 2017 alone that likely totaled at least $50,000.00.

65.     Because AFB did not touch any of her own savings to pay for these improvements, she further benefited from her husband's theft from Sea Salt and is enjoying a home worth more than $600,000.00, plus improvements financed by theft.

66.     In 2017, MRB and ARB spent $1,093.50 in new countertops for their home, which was financed by profits illegally obtained from Sea Salt.

67.     The emails Sea Salt has obtained related to this transaction show that AFB did not pay for home improvement projects out of her savings account, but instead the projects were financed with their money jointly.

68.     Upon information and belief, AFB was predominantly in charge of, and kept a close eye on, the family finances.

69.     In late 2017, MRB had his $1,826.92 Sea Salt payroll check direct deposited on a weekly basis to the bank account ending in 9899, which AFB has claimed was her own savings account.

70.     AFB monitored and used for her own purposes the same lobsterorder@gmail.com address that MRB used to conduct illegal business.  Sometimes, AFB would use this email address and the name associated with it would be her daughter's, raising a red flag as to why two parents would email in their child's name when conducting commercial and other business transactions.

71.     Lobsterorder@gmail.com was supposed to be MRB's work email address, further calling into question why AFB would use this address, either in her own name or her daughter's name.

72.     In an email dated December 1, 2017, AFB admitted that MRB's behavior was "so sketchy and secretive." This email pertained to a CMP Bill in the amount of $305.57.

73.     AFB was not just an innocent, naïve wife without a grasp on the couple's finances. Instead, she took note of every bank transaction, likely in every single joint account they owned.

74.     In her email to "[daughter's name] Bellerose," lobsterorder@gmail.com, AFB remarked she had never seen the CMP bill for $305.57. She criticized the amount of this bill as being "a LOT of money for a rundown house that nobody lives in."

75.     AFB was informed of her husband's theft and embezzlement from Sea Salt as of June 22, 2018 when Plaintiff confronted MRB. AFB knew that Sea Salt was seeking a return of stolen profits. Plaintiff had extensive communications with AFB for over a month before the attachment was granted.

76.     Upon information and belief, AFB was a knowing participant in transferring assets or cash as soon as she and MRB became aware that Sea Salt was demanding to be repaid from MRB's embezzlement. To the extent that AFB participated in any effort to divert assets or cash because of this claim, she has engaged in a fraudulent transfer under Maine Law.

77.     Starting as far back as 2014, AFB was conducting eBay transactions under the user name "mymaineman207," with emails about her transactions going to the lobsterorder@gmail.com inbox.

78.     On March 3, 2018, AFB, via lobsterorder@gmail.com, purchased a Rolex from eBay for $4,599.00.

79.     AFB viewed other eBay transactions that suggested she was knowingly spending (or looking to spend) money that far exceeded the typical budget of a nurse and lobster salesman, such as expensive handbags, cars, and more Rolexes.

80.     The Bellerose family vacationed well during MRB's longstanding theft. In 2016, AFB booked a trip to the Bahamas for the entire family that cost more than $7,000.00. This was one of several times that the family took similar, expensive trips to the Atlantis Resort in the Bahamas.

81.     In February of 2018, AFB used the lobsterorder@gmail.com account to book a trip to the Seminole Hard Rock Hotel & Casino in Hollywood, Florida.

82.     Just a couple of months later, she booked a Father's Day trip for MRB to the Harborside Hotel in Bar Harbor, for just over $1,500.00. This travel confirmation was sent to the name "[MRB and AFB's daughter] Bellerose," at lobsterorder@gmail.com.

83.     AFB was fully aware that MRB purchased classic cars, a tractor and a skid steer, ATVs for himself and his children, snowmobiles, expensive sports camps for his children, a brand-new Chevy Tahoe, a boat share, and many more expensive vacations. The value of the personal property jointly held by MRB and AFB, which was financed by theft from Sea Salt, likely exceeds $80,000.00.

84.     If MRB and AFB had a joint bank account with $100,000.00 in it starting in 2013, which AFB has suggested under oath, their spending habits and personal property that has been purchased since that time would have depleted this amount of money almost completely.

### Defendant Anthony J. Mastropasqua's Participation in the
### Fraudulent Scheme to Embezzle from Sea Salt

85.     Upon information and belief, VJM's brother, Anthony Mastropasqua ("AJM"),

was also involved in the fraudulent scheme to embezzle from Sea Salt and engage in multiple

criminal violations under RICO, as outlined below.

86.     In June of 2014, AJM sent an email address from his real estate investment

company (BKM Properties, bkm119@gmail.com), requesting that MRB sell him a full container

of lobster tails.  MRB informed AJM that he had 4-5 oz frozen lobster tails at $17.50/lb., and

they came in 10-lb. cases.

87.     A container of lobster tails is roughly 30,000 pounds of product.  At $17.50/lb., a

container would cost $525,000.00, and the shipping would be more than $7,000.00.

88.     Upon information and belief, AJM has no business connection to the lobster

industry and does not resell lobster for any legitimate reason.

89.     There is no legitimate, credible, or common-sense explanation for why AJM was

looking to sell over $500,000.00 worth of lobster to "these guys," who his email does not name,

other than a criminal conspiracy to steal from Sea Salt.

90.     In addition, AJM's email to MRB indicated that "these guys . . . need a better

price," suggesting that MRB was stealing the inventory from Sea Salt without their knowledge,

selling the lobster tails for less than market price, and sharing the proceeds with AJM and/or his

brother VJM.

91.     When Sea Salt confronted MRB about his embezzlement, MRB admitted that the

fraudulent scheme involved "Vinny's brother Anthony," who had connections in New York.

92.     Upon information and belief, AJM is involved in another potentially criminal enterprise, which makes him a likely participant in the criminal/fraudulent scheme described herein.

93.     Like VJM, MRB, and East End, AJM maintains a PO Box at the UPS Store located in Scarborough, which is box number 278.

## Negligence on the Part of UPS's Agents and Employees

94.     In VJM's Affidavit in support of his Motion to Dissolve the Attachment, he admitted that he works "part time" at The UPS Store, Inc. As an employee of The UPS Store, Inc., which is a wholly owned subsidiary of UPS, Defendant VJM took actions in the scope of his employment to embezzle and illegally ship lobster stolen from Sea Salt.

95.     MRB directly worked with UPS when its agents and employees would pick up orders at the end of the day for shipment.

96.     UPS's agents and employees knew or should have known that certain orders seemed excessively large to the point of raising significant suspicion. For instance, on certain days UPS would pick up 4-5 full pallets of lobster shipments, which is extremely excessive.

97.     UPS's agents and employees, acting within the scope of their employment, violated UPS policies and procedures and negligently failed to notice that the return address labels were not correct, because the orders were coming from Sea Salt, but the return address was a PO Box in Scarborough, for either "Mastro's" or "East End Transport."

98.     UPS typically had the same driver pick up orders each day from Sea Salt. This was not a typical ground delivery driver for UPS, but instead the driver's role was to take orders directly to the airport for shipment.

99.     This particular UPS driver spent a good amount of time at Sea Salt waiting for orders, and sometimes had conversations outside with warehouse employees.  Upon information and belief, the UPS driver should have detected, based on employee training and UPS's own policies and procedures, that the behavior of MRB, and other aspects of the shipping practices he oversaw at Sea Salt, was not normal and raised multiple red flags about possible illegal activity.

100.    Acting within the scope of her employment, with the express purpose of furthering UPS's interests, the UPS driver negligently failed to detect MRB's fraud and negligently agreed to assist MRB in the mislabeling of packages.

101.    The UPS driver admitted to Plaintiff that Defendant MRB instructed her to cover up the return address label on the boxes to be shipped.

102.    For instance, MRB told the UPS driver to place bright orange "Saturday delivery" stickers over the return address labels that showed the discrepancy between where the shipment originated (Sea Salt in Saco), and the return address (East End or Mastro's at the UPS Store in Scarborough).

103.    MRB gave the UPS driver instructions about covering up labels in order to avoid detection from his partners if a shipment was returned, because if the other members of Sea Salt, LLC discovered that the return address was a PO Box in Scarborough, they would instantly discover the discrepancy and MRB's fraudulent scheme.

104.    In addition, MRB had set up the invoicing for Mastro's and East End to be his and VJM's PO Box in Scarborough (201 U.S. Route 1, Number 316), where they would collect payment, but he did not want a package that was rejected or returned by a customer to go to that PO Box.

105.    The UPS driver acted negligently within the scope of her employment when she took the actions described above and covered up labels at the request of MRB.

106.    UPS acted negligently in failing to train the employees that picked up shipments from Sea Salt to detect, report, and refuse to participate in the kind of shipping irregularities described herein, which are known within the industry to be a harbinger of illegal activity.

107.    UPS profited tremendously from the illegal shipments described herein and collected a significant sum of fraudulent/false shipping charges.

### RICO Violations

108.    Using the customer name "Mastro's," which is the last name of VJM and/or AJM, Defendants sold product that it stole from Sea Salt to customers all over the country, predominantly of Asian descent.

109.    Some of the shipments went to individual homeowners, but the majority of large, fraudulent orders were shipped to nail salons all over the United States.

110.    In September of 2016, a Massachusetts-based nail salon proprietor named Tim Khiev emailed MRB "Hi Matt . . . So you need to pay me back 75 lbs of $2 total $450 right . . . Please let me know thanks." Khiev attached an invoice, which was for various weight of live lobster, plus charges for "shipping – Chan," "shipping-Thoeung," "shipping-Pat," and "shipping-Classy Nail." The payment for this invoice was $1,119.19, billed to Sothea Khiev in Lowell, MA. The fact that MRB received a kickback from Khiev for 75 lb. of $2 total, or $450.00, suggests that this transaction was not at all a legitimate sale of lobster to this customer.

111.    Upon information and belief, some of the contacts for "Mastro's" customers came from Khiev.

112.    Upon information and belief, some of the product that Defendants stole from Sea Salt was sold to Family Seafood, Inc., a Scarborough, Maine entity with which Khiev is affiliated, for national or international distribution.

113.    Upon information and belief, VJM and AJM introduced MRB to other fraudulent nail salon customers who wanted to buy product that had been stolen from Sea Salt.

114.    Defendants fulfilled fraudulent orders to some customers, such as Phong Nguyen, using a PayPal account, Western Union, and/or credit card transactions.

115.    In addition, VJM works at Republicash, LLC, which provides him with the opportunity to engage in fraudulent wire transfers, check cashing, money orders, and other financial transactions in furtherance of the fraudulent scheme described herein.

116.    Defendants MRB, VJM, AJM, and East End engaged in concerted action to violate 18 U.S.C. § 659, which prohibits fraud, deception, theft, or embezzlement from any warehouse or storage facility (such as Sea Salt) of "any goods or chattels moving as or which are a part of or which constitute an interstate . . . shipment of freight, express, or other property" with intent to convert such goods to his own use.  This Federal crime also prohibits buying or receiving any such goods or chattels "knowing the same to have been embezzled or stolen."

117.    Defendants MRB, VJM, AJM, and East End engaged in concerted action to violate 18 U.S.C. § 1341, the Federal Mail Fraud Statute, by knowingly participating in a scheme to defraud Sea Salt and cause the mails, as well as UPS, to be used in furtherance of their fraud, with the intent to deceive.

118.    Defendants MRB, VJM, AJM, and East End engaged in concerted action to violate 18 U.S.C. § 1342, by using a fictitious name to carry out their mail fraud under 18 U.S.C. § 1341.

119.   Defendants MRB, VJM, AJM, and East End have also engaged in concerted action to commit wire fraud within the meaning of 18 U.S.C. § 1343.

120.   Defendants VJM and AJM, upon information and belief, have engaged in concerted action to violate 18 U.S.C. § 1512 by intentionally obstructing this proceeding and engaging in witness tampering, which caused or induced MRB and AFB to submit text messages falsely disclaiming VJM's involvement in this case, which were provided to this Court in order to dissolve the attachment against VJM.

121.   Defendants MRB, VJM, AJM, and East End have engaged in concerted action to violate 18 U.S.C. § 1952 by traveling in interstate commerce and using the mail with the intent to distribute the proceeds of their unlawful activities and otherwise promote, manage, establish, carry on, and facilitate the promotion of their unlawful activities.

122.   Defendants MRB, VJM, AJM, and East End have engaged in concerted action to violate 18 U.S.C. § 1957 by engaging in monetary transactions in property derived from specified unlawful activities, with a value that exceeds $10,000.

123.   Defendants MRB, VJM, AJM, and East End have engaged in concerted action to violate 18 U.S.C. § 2314 by transporting stolen goods in interstate commerce.

124.   Defendants VJM, AJM, East End, and others whose identities are as yet unknown, have violated 18 U.S.C. § 2315 by receiving, possessing, concealing, storing, bartering, selling, or disposing of, goods stolen from Sea Salt in a value that exceeds $5,000, which have crossed state lines after being stolen.

## COUNT I – CONVERSION
### (Defendants MRB, AFB, VJM, AJM, and East End)

125.   Plaintiff repeats the allegations contained in Paragraphs 1 through 124 as if fully stated herein.

126.    Sea Salt had a valid property interest in its own inventory of live lobster, the income used by MRB to pay for shipping costs that were never invoiced to "Mastro's," and profits from the sale of live lobster to Mastro's that were never paid to the company.

127.    Defendants MRB, VJM, AJM, and East End converted and misappropriated the property described above for their own use with the specific intent to defraud Sea Salt and its other members, all of whom had the right to possess the property converted.

128.    After being made aware of the full details of this fraudulent scheme and profits/inventory stolen from Sea Salt, Defendant AFB converted those profits from stolen inventory to her own use, and fraudulently transferred cash and assets rightfully belonging to Sea Salt for her own use.

129.    Sea Salt made a demand to each of the Defendants for return of the proceeds earned from property converted by them, which was refused.

130.    Defendants engaged in intentionally outrageous conduct, or alternatively consciously disregarded the harm that their conduct would cause Sea Salt, such that malice can be implied, justifying an award of punitive damages.

131.    As a result of Defendants' conversion, Sea Salt has suffered economic loss and other harm, justifying an award of compensatory damages in excess of $1.4 million.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court award it damages for conversion against MRB, AFB, VJM, AJM, and East End, punitive damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to the company by law.

## COUNT II – FRAUD
### (Defendants MRB, AFB, VJM, AJM, and East End)

132.     Plaintiff repeats the allegations contained in Paragraphs 1 through 131 as if fully stated herein.

133.     Defendant MRB acquired an ownership interest in Sea Salt, LLC that was procured by fraud, with the specific intent to embezzle significant sums of money from the company through a fraudulent lobster shipping scheme.

134.     Defendant MRB made fraudulent misrepresentations of material facts to Sea Salt, LLC, which he knew to be false, about his role within the company and his method of fulfilling lobster orders for certain fictitious customers, in order to induce justifiable reliance on the part of Sea Salt.

135.     Defendant MRB's fraudulent misrepresentations to Sea Salt induced them to refrain from checking on his fulfillment of lobster orders, and the UPS shipping process he used while an employee and also a member of the LLC.

136.     Sea Salt justifiably relied on Defendant MRB's fraudulent misrepresentations to its detriment.

137.     Defendant MRB engaged in the aforementioned fraudulent conduct knowingly and intentionally, justifying an award of punitive damages.

138.     Sea Salt has suffered extensive harm and economic loss as a result of the fraudulent embezzlement perpetrated by Defendant MRB.

139.     VJM and AJM participated in the fraud perpetrated by Defendant MRB, and VJM made intentionally false and misleading statements of material fact to this Court in an effort to convince the Court to dissolve the attachment against him, and release a significant amount of cash to be further converted for Defendants' ongoing illegal purposes.

140.   Upon information and belief, after she learned that Sea Salt was pursuing reimbursement of significant sums of cash from her husband for his illegal and fraudulent scheme, Defendants AFB and MRB participated in a fraudulent transfer of certain cash and assets, with the intent of hiding such assets from Plaintiff.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court award it damages for Defendants' fraudulent scheme to embezzle money from the company, along with punitive damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to the company by law.

### COUNT III – UNJUST ENRICHMENT
### (Defendants MRB, AFB, and VJM)

141.   Plaintiff repeats the allegations contained in Paragraphs 1 through 140 as if fully stated herein.

142.   Defendants MRB and AFB received the benefit of significant sums of money from the conversion and sale of lobsters belonging to Sea Salt, which Defendants were not entitled to keep.

143.   At least as early as June 21, 2018, when Sea Salt confronted MRB about his fraudulent embezzlement, AFB and MRB appreciated or knew of the financial benefit conferred upon them by virtue of the fraudulent scheme outlined above.

144.   Despite specific demands to MRB and AFB for return of the profits from the fraudulent scheme outlined above, MRB and AFB have retained such profits.

145.   The circumstances under which MRB and AFB have knowingly retained or fraudulently conveyed illegal profits that belong to Sea Salt make it inequitable for MRB or AFB to retain such profits without being required to repay them.

22

146.    Defendant VJM has also been unjustly enriched because he has sworn under oath that he was paid $300 per week by "East End Transport, LLC," which was a sham entity with no legitimate business operations.

147.    Based on his own sworn testimony, Defendant VJM had no reason to believe that he was entitled to $300 per week from "East End Transport, LLC," which had no discernable way of earning income to be paid out to him other than theft.

148.    In reality, Defendant VJM has likely been unjustly enriched to an extent far greater than $300.00 per week from East End Transport, LLC, under circumstances that demonstrate he appreciated the benefit conferred upon him from the illegal theft and sale of lobster from Sea Salt.

149.    Despite Sea Salt's demand to VJM that he repay the profits he illegally gained from the theft and sale of lobsters from Sea Salt, VJM has knowingly retained or fraudulently conveyed such profits, under circumstances that make it inequitable for him to retain such profits without repaying the same.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court enter judgment in its favor and against Defendants MRB, AFB and VJM, award it equitable and injunctive relief including without limitation the imposition of a constructive trust as a remedy to prevent unjust enrichment, disgorgement of profits retained by Defendants, and such other and further relief as this Court deems just and equitable.

### COUNT IV – NELIGENCE
### (Defendant UPS)

150.    Plaintiff repeats the allegations contained in Paragraphs 1 through 149 as if fully stated herein.

151.    Defendant UPS owed a duty of reasonable care to its customers to ensure that its employees received proper training and followed all UPS policies and procedures with regard to the performance of job duties.

152.    Defendant UPS also owed a duty to its customers to train employees on the detection of fraud and fraudulent shipping practices, for which UPS charged customers.

153.    UPS's employees also owed customers a duty of reasonable care in the performance of their job duties.

154.    UPS's employees were negligent in the performance of their job duties.

155.    The job duties described above, which were negligently performed by UPS employees, were of a kind they were specifically employed to perform.

156.    UPS employees' negligent performance of their job duties occurred substantially within authorized time and space limits while working for UPS.

157.    UPS employees' negligent performance of their job duties was motivated by a purpose to serve UPS.

158.    The harm to Sea Salt from the negligence of UPS's agents and employees was entirely foreseeable.

159.    As a direct and proximate result of the negligence of UPS's agents and employees, Sea Salt has suffered harm and significant economic damages.

160.    UPS is vicariously liable for the negligent acts of its agents and employees.

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against UPS for negligence, awarding economic damages, interest, costs, attorney's fees, and such other and further relief as this Court deems just and equitable.

## COUNT V – CIVIL CONSPIRACY
### (Defendants MRB, VJM, AJM and East End)

161.    Plaintiff repeats the allegations contained in Paragraphs 1 through 160 as if fully stated herein.

162.    Defendants MRB, VJM, AJM and East End acted in concert with one another to accomplish the fraud and conversion set forth above.

163.    All of the Defendants worked in concert with the common goal of accomplishing the fraud and conversion set forth above, for their own financial benefit.

164.    Defendants' collective conspiracy to commit fraud, conversion, and theft of Sea Salt's inventory and profits was unlawful under both civil and criminal law.

165.    As a result of Defendants' civil conspiracy, Sea Salt has suffered extensive damages and economic harm.

166.    Defendants acted with actual malice and the specific intent to defraud Sea Salt, justifying an award of punitive damages.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court award it damages for Defendants' civil conspiracy, along with punitive damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to the company by law.

## COUNT VI – CIVIL RICO (VIOLATION OF 18 U.S.C. § 1962(C))
### (Defendants MRB, VJM, AJM and East End)

167.    Plaintiff repeats the allegations contained in Paragraphs 1 through 166 as if fully stated herein.

168.    Defendants MRB, VJM, AJM, and East End are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the criminal enterprise and fraudulent scheme

described above through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(C) ("RICO").

169.   Defendants' above-described criminal enterprise and fraudulent scheme affected interstate commerce.

170.   Defendants' above-described criminal enterprise and fraudulent scheme was part of a pattern of continuous, related instances of criminal behavior that amounted to racketeering activity within the meaning of 18 U.S.C. § 1961.

171.   Defendants' racketeering activity involved numerous separate acts and transactions, each constituting a crime within the meaning of RICO, that amounted to at least 2 separate criminal acts that affected multiple parties.

172.   There is a threat of continued criminal activity on the part of the Defendants.

173.   Plaintiff Sea Salt has been injured in both its business affairs and its property.  Sea Salt has suffered actual, extensive harm and damage to its business and economic interests because of the RICO violations set forth herein.

174.   Because of Defendants' RICO violations, Sea Salt is entitled to treble damages plus attorney's fees under 18 U.S.C. § 1964.

175.   RICO § 1964(a) also authorizes the Court to "prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons."

176.   Based on the above, Plaintiff seeks an "appropriate order" disgorging the profits illegally gained by Defendants MRB, AFB, VJM, AJM, and East End, as well as disgorgement or forfeiture of any proceeds of their fraud that has been paid to their attorneys.

177.   Plaintiff also seeks an order divesting Matthew R. Bellerose of his ownership interest in Sea Salt, LLC, or dissolution/reorganization of Sea Salt, LLC without Matthew R. Bellerose as a member of the LLC.

WHEREFORE, Plaintiff Sea Salt requests that the Court enter judgment in its favor and against Defendants MRB, VJM, AJM and East End on its Civil RICO claim, award monetary damages, treble damages, disgorgement of profits, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT VII – RICO CONSPIRACY
### (Defendants MRB, VJM, AJM and East End)

178.   Plaintiff repeats the allegations contained in Paragraphs 1 through 177 as if fully stated herein.

179.   For all of the reasons set forth above, including the elements of RICO alleged in Count VI, Defendants MRB, VJM, AJM and East End have unlawfully conspired to violate the provisions of 18 U.S.C. § 1962(c).

180.   As a direct and proximate result of Defendants' conspiracy to commit the multiple RICO violations set forth above, Sea Salt has been and continues to be injured in its business or property.

WHEREFORE, Plaintiff Sea Salt requests that the Court enter judgment in its favor and against Defendants MRB, VJM, AJM and East End on its Civil RICO conspiracy claim, award monetary damages, treble damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Defendant MRB)

181.     Plaintiff repeats the allegations contained in Paragraphs 1 through 180 as if fully stated herein.

182.     Sea Salt, LLC is a closely held LLC because it has a small number of members, no ready market for an equity stake in the company, and all of its members are intimately involved in the management, direction, and operations of the LLC.

183.     Defendant MRB owed Sea Salt, LLC and its members the utmost duty of good faith and loyalty.

184.     Defendant MRB engaged in significant and longstanding self-dealing, to Sea Salt's detriment.

185.     Sea Salt has suffered extensive harm and economic loss as a result of Defendant MRB's breach of fiduciary duty.

186.     Due to the fraudulent scheme and breach of fiduciary duty set forth above, the Court should consider Defendant MRB's acquisition of a membership interest in Sea Salt, LLC to be null and void.

187.     Plaintiff Sea Salt specifically demands that the Court grant the equitable remedy of rescinding the contract between Sea Salt and MRB in which MRB was granted an ownership interest in the company, because that ownership interest was procured by fraud.

188.     Alternatively, Sea Salt seeks an order of dissolution of the LLC based on MRB's fraud.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court enter judgment in its favor and against Defendant MRB for breach of fiduciary duty, grant equitable relief in the form of rescinding the contract between Sea Salt and MRB, plus disgorgement of any profits received or

retained by MRB, or alternatively dissolution of the LLC and the ownership interest granted to Defendant MRB, plus all other and further relief as this Court deems just and appropriate.

### COUNT IX – NEGLIGENT MISREPRESENTATION
#### (Defendants MRB, VJM, and AJM and East End)

189.    Plaintiff repeats the allegations contained in Paragraphs 1 through 188 as if fully stated herein.

190.    Sea Salt was supplied false information by each of the Defendants: MRB, first as an employee and then as a partner/member of the LLC; East End Transport, LLC, as a purported customer and payor of invoices for "Mastro's" shipments of lobster where the true weight and extent of product shipped was falsified; and VJM or AJM as "Mastro's," the purported customer who paid for only a fraction of the product actually shipped by Sea Salt for their own personal, financial gain.

191.    The above misrepresentations by Defendants were of material facts.

192.    None of the Defendants exercised reasonable care or competence in conveying information and representations to Plaintiff about the extent of the weight and product that was being shipped out of Sea Salt under the customer name "Mastro's."

193.    Sea Salt justifiably relied on Defendants' misrepresentations, believing "Mastro's" to be a legitimate customer that was paying invoices in a timely and non-fraudulent manner.

194.    Sea Salt's justifiable reliance on Defendants' collective negligent misrepresentations has caused it significant economic harm.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court award it damages for Defendants' negligent misrepresentations, along with attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to the company by law.

## COUNT X – BREACH OF CONTRACT
### (Defendant MRB)

195.    Plaintiff repeats the allegations contained in Paragraphs 1 through 194 as if fully stated herein.

196.    In 2014, MRB entered into an employment agreement with Sea Salt whereby he agreed to avoid competing with the company for a period of two months following the separation of his employment.

197.    MRB furthermore agreed under the employment agreement not to disclose Proprietary information such as customer lists.

198.    The agreement between Sea Salt and MRB was supported by adequate consideration, and a mutual intent to be bound.

199.    The agreement between Sea Salt and MRB continued in full force and effect after he became a member of the LLC.

200.    MRB has breached his agreement with Sea Salt, resulting in actual harm, consequential damages, and economic loss to Plaintiff.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court award it damages for Defendant MRB's breach of contract, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to the company by law.

## COUNT XI – VIOLATION OF 10 M.R.S. § 1211 *et seq.*
### (Maine Uniform Deceptive Trade Practices Act)
### (Defendants MRB, VJM, AJM and East End)

201.    Plaintiff repeats the allegations contained in Paragraphs 1 through 200 as if fully stated herein.

202.    Defendants have collectively engaged in deceptive trade practices within the meaning of the Maine Uniform Deceptive Trade Practices Act ("UDTPA"), 10 M.R.S. § 1211(1), including by:

- Passing off "Mastro's" goods or services as those of Sea Salt;

- Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

- Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

- Disparaging the goods, services or business of Sea Salt by false or misleading representations of fact; and

- Engaging in other conduct that creates a substantial likelihood of confusion or misunderstanding among consumers.

203.    Sea Salt is likely to be damaged by the many forms of deceptive trade practices described above, as well as in Plaintiff's Motion for *Ex Parte* Attachment.

204.    Plaintiff is entitled to equitable and injunctive relief against Defendants, including disgorgement of profits and an injunction against further deceptive trade practices, together with attorney's fees and costs of suit, for Defendants' violation of the Maine UDTPA.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court enter judgment in its favor and against Defendants for their deceptive trade practices, and grant monetary, equitable, and injunctive relief, as well as attorney's fees and costs, plus such other and further relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff Sea Salt, LLC hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated at Kennebunk, Maine this 3rd day of October, 2018.

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
BERGEN & PARKINSON, LLC
62 Portland Rd., Suite 25
Kennebunk, ME 04043
(207) 985-7000
*lwhite@bergenparkinson.com*